IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

**FILED**



2:59 pm, 12/16/19

**U.S. Magistrate Judge**

---

NUTRITION CENTER, INC.,

               Plaintiff,

vs.

KING BIO, INC.,

               Defendant.

Case No:  19-CV-00046-MLC

---

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

      This matter comes before the Court upon Plaintiff's Motion for Summary Judgment [Doc. 19].   Defendant responded to the Motion [Doc. 21] and oral argument was held on December 3, 2019.

### I.    BACKGROUND

      This case arises out of a product recall issued by Defendant King Bio, Inc. for products purchased from it by Plaintiff Nutrition Center, Inc.  The products at issue were homeopathic drugs purchased by Plaintiff prior to August 2018 through various purchase orders.  ECF_19-10; ECF_19-1, Affidavit ¶ 4.  The parties agree that the purchase orders constituted binding contracts for the sale of goods between the parties.  ECF_19-12.  On or around August 30, 2018, Plaintiff received a letter ("Recall Notice") from Defendant stating that Defendant had issued a voluntary recall of its aqueous-base products due to potential contamination and the Recall Notice instructed Plaintiff to quarantine

Defendant's aqueous-base products. ECF_19-2. Pursuant to the Recall Notice, Plaintiff inventoried its products and quarantined Defendant's aqueous-base products. ECF_19-1, Affidavit ¶ 12. Another notice directed Plaintiff to return recalled products to Defendant, which it did. ECF_19-3; ECF_19-1, Affidavit ¶¶ 12, 13. Plaintiff incurred costs when it obtained all Defendant products from its distribution network, cancelled certain orders, and reimbursed for products that had already been distributed to independent distributors. ECF_19-1, Affidavit ¶¶ 12, 13.

As part of the recall process, Plaintiff completed a "Recall Form" to receive reimbursement for costs incurred, as requested by Defendant. ECF_19-4. The cost of returned products was $104,706.82 and the amount owed to Plaintiff was $120,819.50. Defendant wrote in an email to Plaintiff that the reimbursement cost was $116,909.22 and admitted the existence and validity of that email. ECF_19-4; ECF_19-5; ECF_19-1, Affidavit ¶ 21; ECF_19-11. Nevertheless, Defendant has failed to reimburse Plaintiff the amount owed. ECF_19-11. Defendant admits that it has not paid Plaintiff its reimbursement amount, but maintains it offered an "in-kind" replacement and that Plaintiff refused its offer to replace the recalled product with new product. *Id.*

Defendant maintains that it lacks sufficient facts to fully respond to Nutri-West's Motion for Summary Judgment and has filed a Rule 56(d) Affidavit. ECF_21-2. To support its argument, Defendant contends that the parties agreed to schedule an additional deposition of Tony White, Plaintiff's president, if Plaintiff's responses to Defendant's First Set of Interrogatories and Requests for Production of Documents left factual issues unresolved. ECF_21 at 2–3. In his affidavit, Defendant's counsel maintains that the

responses left factual questions regarding (a) Plaintiff's own efforts involved in the recall; (b) Plaintiff's independent duty to inspect the products recalled; and (c) the parties' contractual obligations to each other regarding the recall efforts. ECF_21-2 at 2. Additionally, the Rule 56(d) affidavit maintains that the facts currently unavailable that are crucial in responding to Plaintiff's Motion for Summary Judgment include (a) actual language contained in the purchase orders Plaintiff claims as the basis for certain obligations; (b) actual language contained in the alleged quality agreement or manufacturing agreement between the parties governing the production of homeopathic products at issue; (c) the specific steps or acts Plaintiff engaged in to facilitate the recall and the reasonable costs associated with those steps or actions; (d) what Plaintiff's independent duties were as an owner, or seller and distributor of the homeopathic products at issue; (e) what Plaintiff's independent duties were in an FDA recall situation as an owner or seller and distributor of the homeopathic products at issue; (f) whether Plaintiff had an independent duty and obligation to inspect and insure the homeopathic products at issue were not contaminated; and (g) whether Plaintiff failed to independently test and quarantine contaminated homeopathic product.

## II.     STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Mata v. Anderson*, 635 F.3d 1250, 1252 (10th Cir. 2011). When determining whether summary judgment is appropriate, courts view evidence and draw all reasonable inferences in the light most favorable to the non-moving party.

*Mumby v. Pure Energy Servs. (USA), Inc.*, 636 F.3d 1266, 1269 (10th Cir. 2011). A fact is considered material if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue of fact is considered genuine when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

The movant bears the initial burden to demonstrate the basis for its motion and must identify the parts of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any" which "demonstrate the absence of a genuine issue of a material fact." *Reed v. Bennett*, 312 F.3d 1190, 1194 (10th Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). If the movant meets this initial burden, then the non-movant must show more than "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position . . . there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The non-movant must "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to that party's case in order to survive summary judgment." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). Evidence "must be based on more than mere speculation, conjecture or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings" and do not create a genuine issue of fact. *Phillips v. Calhoun*, 956 F.2d 949,

951 n.3 (10th Cir. 1992).  Evidence to defeat summary judgment must also be admissible at trial.  *Equality Bank of Evansville, v. Suomi*, 836 P.2d 325, 330 (Wyo. 1992).

As for Rule 56(d) affidavits, the rule states the following:

(d) When Facts Are Unavailable to the Nonmovant. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
    (1) defer considering the motion or deny it;
    (2) allow time to obtain affidavits or declarations or to take discovery; or
    (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).  Generally, summary judgment should be refused if the non-movant has not had opportunity to discover information *essential* to its opposition.  *Madrid v. Chronicle Books*, 209 F. Supp. 2d 1227, 1232–33 (D. Wyo. 2002).[1]

There are several prerequisites to granting relief under Rule 56(d).  First, an affidavit from the non-movant must explain why certain facts precluding summary judgment cannot be presented and show how a continuance would enable the party to obtain those facts.  *Hackworth v. Progressive Cas. Ins. Co.*, 468 F.3d 722, 732 (10th Cir. 2006); *see also Madrid*, 209 F. Supp. 2d at 1232–33.  The affidavit should identify probable facts unavailable, explain the steps taken to obtain these facts, and explain how additional time will enable the non-movant to rebut the movant's allegations of no genuine issue of fact.  *Id.*  Second, the non-movant must also demonstrate that the new discovery could succeed in defeating summary judgment—relief should be denied if the discovery would not alter the outcome of the motion.  *United States v. Supreme Court of New Mexico*, 839 F.3d 888,

---

[1] Rule 56(d) was previously Rule 56(f) in the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 56(d) advisory committee's note to 2010 amendment.  The *Madrid* court discusses summary judgment issues related to inability to discover information discoverable to a non-movant's opposition in the context of Rule 56(f) before it was renumbered as Rule 56(d).

905 (10th Cir. 2016). Third, a court should consider whether the non-movant was diligent in pursuing discovery of those facts up until that present point. *Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1096 (10th Cir. 2010). A movant's exclusive control over the non-discoverable information weighs heavily in favor of relief under Rule 56(f). *Price ex rel. Price v. Western Resources, Inc.*, 232 F.3d 779, 783 (10th Cir. 2000). However, other circuits have also considered factors such as whether a party waited until the last minute to serve requests. *See Jacked Up, L.L.C. v. Sara Lee Corp.*, 854 F.3d 797, 816 (5th Cir. 2017); *Rivera-Almodóvar v. Instituto Socioeconómico Comunitario, Inc.*, 730 F.3d 23, 28–29 (1st Cir. 2013). Ultimately, the Court has discretion in determining whether to grant or deny relief under Rule 56(d). *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1206 (10th Cir. 2015).

## III.  DISCUSSION

The parties are approaching this issue from two very different viewpoints. Plaintiff asserts that this is a simple sales contract claim under the terms of the Uniform Commercial Code ("UCC"). WYO. STAT. ANN. § 34.1-1-101 *et seq.* (West 2019). According to Plaintiff, Defendant delivered non-conforming goods and, as such, Plaintiff is entitled to the remedies set forth in the UCC. In contrast, Defendant argues that this case is controlled by the terms of the Food and Drug Administration ("FDA") Current Good Manufacturing Practices ("CGMPs"). Therefore, the Court shall first address Plaintiff's arguments under the UCC before turning to the issue of whether the CGMPs are applicable to the case.

### A.  UCC Law Pertaining to Non-Conforming Goods

To be governed by the UCC, there must be a contract for the sale of goods five hundred dollars or more, with writing to indicate that a contract has been made that is signed by the party "against whom enforcement is sought." *Id.* at § 34.1-2-201(a). Contract formation itself is governed by Wyoming Statute § 34.1-2-204, which sets forth the requirements to form a contract under the UCC. However, here, the parties do not dispute that there were contracts created through various purchase orders between the parties and that the UCC applies.[2] Defendant did not state an affirmative defense regarding the statute of frauds.

The heart of this dispute revolves around a buyer's rights and remedies under the UCC when non-conforming goods are delivered. If goods fail to conform to the contract in any respect, buyers may reject the whole, accept the whole, or accept certain commercial units and reject the rest. *Id.* at § 34.1-2-601(a)(i)–(iii). Acceptance of goods can occur when a buyer has had reasonable opportunity to inspect the goods and retains the goods or fails to effectively reject them. *Id.* at § 34.1-2-606(a)(i)–(ii). Rejection of non-conforming goods must occur within a reasonable time after their delivery. *Id.* at § 34.1-2-602(a). After rejection of goods, a buyer is under a duty to follow "any reasonable instructions received from the seller with respect to the goods." *Id.* at § 34.1-2-603(a). In this case, there is no question as to whether Plaintiff rejected the goods at issue—Plaintiff instead accepted the goods and retained the goods afterwards. However, Plaintiff argues

---

[2] Neither party has been able to locate the purchase orders, but both parties agree they existed.

that revocation of the acceptance of the goods occurred and was appropriate under the present circumstances.

Alternatively, buyers may revoke acceptance of goods if nonconformity substantially impairs the value of such goods and the buyer accepted the goods without discovering the nonconformity because acceptance was "reasonably induced either by the difficulty of discovery before acceptance **or** by the seller's assurances." *Id.* at § 34.1-2-608(a)(ii) (emphasis added). Buyers that revoke have the same rights and duties regarding the goods as if they had rejected them, which means that they must follow reasonable instructions from the seller with respect to the goods. *See id.* at § 34.1-2-608(c). Where a buyer rightfully rejects or justifiably revokes acceptance of goods, with respect to the goods involved, the buyer may cancel and recover "the price as has been paid." *Id.* at § 34.1-2-711(a). Plaintiff claims it was appropriate to revoke the goods in question because Plaintiff was reasonably induced to accept them upon delivery from Defendant. First, the goods were sealed and inspection of the goods for nonconformity was impractical.[3] Second, Defendant issued a Certificate of Manufacture that acted as an assurance of conformity by specifying that the product was manufactured according to federal regulations and CGMPs. At first glance, it appears that Plaintiff's revocation was appropriate. Nevertheless, whether or not Plaintiff's revocation was proper under the circumstances is discussed in greater depth below. Prior to such discussion, however, it is necessary to analyze how

---

[3] In so far as Defendant is asserting that Plaintiff had a duty to inspect the goods under the UCC by testing for adulteration, that contention will be discussed with regard to Defendant's arguments pursuant to the CGMPs.

Defendant's arguments pertaining to Plaintiff's duties under FDA regulations relate to the relevant UCC provisions at issue.

## B. *Federal Law Regarding CGMPs*

Despite the apparent lack of contest regarding Plaintiff's right to recover under the UCC, Defendant maintains that FDA rules and regulations required Plaintiff to perform its own testing of the subject products and failure to do so constitutes a failure to mitigate damages, which prevents recovery. The statutory authority for the FDA regulations is found in the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§301 *et seq.* In so far as Defendant is attempting to use the regulations as a private cause of action, it fails. The Act does not contain any right to a private cause of action, but rather is for the enforcement efforts of the FDA. *Durr v. Strickland*, 602 F.3d 788, 789 (6th Cir. 2010), *cert. denied* 559 U.S. 1087 (2010). Defendant asserts the Act creates a duty and Plaintiff's failure of that duty is tantamount to a breach of the duty to mitigate damages.[4] This argument fails for a number of reasons.

Turning to the FDA regulations, it is first important to understand that federal regulations require that CGMPs, including oversight and controls, are followed in drug product preparation. 21 U.S.C. § 351 (2018); 21 C.F.R. § 211.1(a) (2019). This requires practices such as establishing a quality control unit, creating and following written procedures for the quality control unit, establishing laboratory facilities for testing and approval, and performing laboratory testing to ensure drug products are free from

---

[4] Defendant does not provide any legal authority that an alleged violation of CGMPs can be considered a failure to mitigate damages under the UCC.

objectionable microorganisms. 21 C.F.R. §§ 211.22, 211.113(a)–(b), 211.165(b). Moreover, CGMP requires establishing recall procedures to mitigate the expense of retrieving products subject to recalls. *Id.* at § 211.150(b).

Defendant argues that federal regulations require Plaintiff to follow these same CGMP practices, even though Plaintiff merely sells Defendant's final products to independent distributors who then sell to "members of the healing arts." ECF_21-2 at 6. To support its argument, Defendant maintains that Plaintiff "manufactures" products according to the FDA definition of manufacture, which states that "[m]anufacture, processing, packing, or holding of a drug product includes packaging and labeling operations, testing, and quality control of drug products." 21 C.F.R. § 210.3(b)(12). Defendant further cites to the *Contract Manufacturing Arrangements for Drugs: Quality Agreements* guidance ("the Guidance"), which notes that owners of a drug product are responsible for approving or rejecting a contract facility's product or service and are responsible for approving or rejecting drugs manufactured by a contract facility, including approving or rejecting drugs for final release. ECF_19-9 at 5, 7. "Owners" are defined "as *manufacturers* of APIs, drug substances, in-process materials, finished drug products . . . and combination products." *Id.* at 2 (emphasis added). "Owner" excludes "retailers who purchase finished drug products to sell over the counter as a store brand." *Id.* According to Defendant, Plaintiff does not fall within the exception to "owner." Thus, because "[m]anufacturing includes processing, packing, holding, labeling operations, testing, and quality unit operations" and Plaintiff is not excepted from the term "owner,"

Plaintiff was an owner who contracted with Defendant and had its own duty to test the subject drug products prior to distribution.

Contrary to Defendant's arguments, the Court concludes that Plaintiff does fall within the exception to the term "owner" and is, thus, not required to follow standard CGMPs with regard to the subject drug products. Plaintiff purchases a finished drug product from Defendant that comes complete with a Certificate of Manufacture which asserts that the product complies with the CGMPs. The product is sealed and packaged, and Plaintiff does not alter the product in any way prior to selling the finished, ready-to-use drug product to "members of the healing arts." Plaintiff's actions are analogous to those defined in the Guidance's exception to "owner."

The spirit and purpose of the CGMPs, as interpreted by other courts, further evince that Plaintiff does not count as an "owner" as defined in the Guidance, nor a manufacturer who must follow CGMPs for the subject drug products. In interpreting CGMP requirements, courts leave little room for doubt that FDA CGMP regulations are intended to address actual manufacturing—the processes that "give rise to a risk of adulteration." *Nutritional Health All. v. Food & Drug Admin.*, 318 F.3d 92, 100 (2d Cir. 2003); *see also Lohr v. Medtronic, Inc.*, 56 F.3d 1335, 1350 (11th Cir. 1995) (explaining that the CGMP requirements are "certainly specific to manufacturing" without using the FDA's niche definitions for "manufacturing"); *United States v. 789 Cases, More or Less, of Latex Surgeons' Gloves, on Article of Device*, 799 F. Supp. 1275, 1288–89 (D.P.R. 1992) (distinguishing how the approval of the release of a drug product for distribution must rest with the manufacturer of a drug product, not a distributor). The purpose of the CGMP

provisions is to prevent distribution of poorly manufactured drugs. *In re Grand Jury Subpoena*, 220 F.R.D. 130, 154 (D. Mass. 2004); *789 Cases, More or Less, of Latex Surgeons' Gloves, on Article of Device*, 799 F. Supp. at 1285. It is understood that those who are distributing drugs may engage in practices where they are holding the drugs for distribution in a manner which results in the adulteration of those products and, as such, must comply with the standards set forth in the CGMPs. There are no allegations in this case that Plaintiff held these drugs in any way which caused or contributed to adulteration of those drugs. It may well be that Plaintiff would have liability pursuant to an FDA enforcement action as the CGMPs create strict liability in some respects. The same could be said for the strict liability in tort for products as adopted in Wyoming. *Ogle v. Caterpillar Tractor Co.*, 716 P.2d 334, 341 (Wyo. 1986). Such strict liability is designed to protect the consumer, not those involved in the manufacture, distribution, and sales of such products. Defendant does not contest that any contamination of the product at issue was a direct result of failures during the manufacturing process of Defendant. The CGMPs are not a tool for manufacturers of adulterated products to shift the costs of their failures onto innocent distributors.

The question presented to this Court is not whether Plaintiff is in violation of a federal regulation, but rather if Plaintiff's alleged violation is in any way a defense to Defendant's breach of the UCC. The CGMPs are regulations designed to protect the public from exposure to adulterated products. Meanwhile, the UCC addresses the legal relationship between the parties to a sales contract. The CGMPs are only relevant in so far as they are implicated by the application of the UCC to this matter.

Returning to analysis of the UCC, Plaintiff claims it revoked acceptance of the subject goods upon the notification by Defendant that the goods were being recalled due to potential contamination. Plaintiff is entitled to revoke acceptance if the goods were accepted "(i) [o]n the reasonable assumption that its nonconformity would be cured and it has not be seasonably cured; or (ii) [w]ithout discovery of the nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances." WYO. STAT. ANN. § 34.1-2-608(a)(i)–(ii). The revocation must "occur within a reasonable time after the buyer discovers or should have discovered" the non-conformity. *Id.* at § 34.1-2-608(b).

Defendant fails to address Plaintiff's arguments regarding application of the CGMPs in relationship to the provisions of the UCC. There are two questions presented which must be addressed by the court. First, whether the revocation of acceptance was proper because the nonconformity was not reasonably discoverable or acceptance was induced by seller's assurances. Secondly, whether the revocation of acceptance was timely after nonconformity was discovered or should have been discovered.

### i. Whether Revocation was Proper

This case is unique in that the revocation was induced and effectively demanded by the Defendant seller upon discovery of potential contamination. Defendant notified Plaintiff of a potential contamination and requested that the product be held for return. The original acceptance of the goods included certification by Defendant that the goods were conforming and manufactured in compliance with the CGMPs. The certificate reads in relevant part: "[t]he undersigned certifies that the above product was manufactured … in

13

accordance with the specifications of the cGMP (current Good Manufacturing Practices) from 21 CFR (Code of Federal Regulations)- Parts 210 and 211." ECF_19-8.  Assuming Defendant is claiming that the Plaintiff should have discovered the non-conformity by complying with the requirements of the CGMPs either upon acceptance or within a reasonable time upon acceptance when it asserts there was a duty to mitigate, the Court will consider Defendant's argument.  Wyoming Statute § 34.1-2-608 allows for revocation of acceptance if the acceptance was reasonably induced by difficulty of discovery or seller's assurances.  In this case the Defendant seller provided assurance that the product was manufactured in accordance with the CGMP.  The statute language allows a buyer to rely upon difficulty of discovery *or* seller's assurances.  Nevertheless, whether a buyer acted reasonably under the circumstances would typically be a question of fact for the jury. The same can be said as to whether the revocation occurred within a reasonable period of time after the buyer discovered or should have discovered the nonconformity.

It is therefore necessary to determine if a question of fact is presented.  Plaintiff has established that it received goods which were nonconforming as Defendant does not contest this point.  It is also non-contested that Defendant notified Plaintiff the goods were being recalled voluntarily as potential contamination was discovered by Defendant in control samples held at its manufacturing facility.  It is further agreed that Plaintiff acted in accordance with the instructions of Defendant and proceeded to immediately secure and return the product covered by the voluntary recall.  Moreover, it is not contested that Defendant provided certification that the product was manufactured in accordance with the CGMP requirements.  Therefore, the uncontested facts show that Plaintiff has satisfied a

prima facia case for the revocation of acceptance pursuant to Wyoming Statute § 34.1-2-608.

Defendant arguably asserts that the Plaintiff should have discovered the defective product upon receipt by CGMP-mandated testing. As noted above, this Court does not agree that the CGMP mandates such testing by Plaintiff, but assuming it did, the UCC allows for a party to the sales contract to rely upon the assurances provided by the seller in lieu of its own discovery when discovery is difficult. Wyoming Statute § 34.1-2-608(a)(ii) states that a buyer is excused from discovery of a nonconformity when induced by difficulty of discovery **"or"** seller's assurances. In this case the Plaintiff has established reliance upon seller's assurances.

### ii.    Whether Revocation was Timely

While not raised specifically by Defendant, Defendant's argument could extend to the reasonableness of the timing of the discovery. Plaintiff has shown that it acted immediately and in accordance with Defendant's instructions upon notice of nonconformity. If Defendant is asserting that Plaintiff should have known of the nonconformity sooner, it must produce evidence by which a tryer of fact could determine the timing of the revocation was unreasonable.

Defendant has presented no such evidence. The voluntary recall was instituted as a result of testing of control samples maintained by Defendant. As a result, Defendant instituted a recall of all aqueous-based product produced during a relevant time frame. Neither party has provided information as to how the recalled product was defined, or the time frame involved. Further, there is no evidence, expert or otherwise, indicating what

testing was conducted, what testing was necessary to find the type of contamination involved, what testing is commercially reasonable, if testing upon the time of delivery would have revealed the contamination, if the product in Plaintiff's possession was in fact contaminated, and when the product was delivered to Plaintiff in relationship to Defendant's notification of the recall. The goods at issue were never shown to be contaminated, but only to have been produced in a facility in which some contamination was present at some point in time. This rendered the goods non-conforming regardless of the presence of contamination in the actual goods delivered to Plaintiff. In addition, Defendant presents no factual information as to how a discovery by Plaintiff sooner would have reduced its costs of complying with the recall and thus mitigated damages. Defendant asks this Court to engage in wholesale speculation without showing any admissible evidence to support its factual or legal contentions. Defendant fails to show that a question of material fact exists with regard to Plaintiff's claim that it is entitled to damages for goods to which it rightfully revoked acceptance. Plaintiff effectively revoked its acceptance of the non-conforming goods at issue and Plaintiff's right under the UCC is to recover the price that was paid for the goods—which the parties have agreed is $116,909.22. *See* WYO. STAT. ANN. at §34.1-2-711(a).

### C. UCC Law Pertaining to Implied Warranty of Merchantability

Even if Plaintiff had not effectively revoked its acceptance of the non-conforming goods, Defendant's delivery of product, which was then recalled due to health and safety concerns, violated the implied warranty of merchantability. Where a contract is governed by the UCC, there is also an implied warranty of merchantability when the seller is a

merchant. *Id.* at § 34.1-2-314. A merchant is "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction." *Id.* at § 34.1-2-104(a). For goods to be considered merchantable, they should: (i) pass without objection in the trade; (ii) be of fair average quality; (iii) be fit for the ordinary purposes for which they are used; (iv) run of even kind, quality and quantity within the variations permitted by the agreement; (v) be adequately contained, packaged, and labeled; and (vi) conform to the promises or affirmations made on the container or label. *Id.* at § 34.1-2-314. For the sale of goods, the UCC comments clarify that it is necessary to show that the implied warranty of merchantability was broken, and that breach of the warranty was the proximate cause of the loss suffered. *Id.* at § 34.1-2-314 cmt. 13.

There is no dispute that Defendant deals in aqueous-based homeopathic drugs and holds itself out as a company having both knowledge and skill. ECF_1 at 2; ECF_12 at 1. Therefore, Defendant qualifies as a merchant subject to the UCC's implied warranty of merchantability. In this instance, the goods could not possibly pass without objection in the trade since Defendant issued a recall notice for possible adulterations. No purchaser of drug products would consider potentially adulterated products acceptable. Likewise, potentially adulterated drugs do not qualify as a fair average quality, since the FDA has specific mandates regarding quality control procedures to prohibit the risk of adulterated drug product sales. Moreover, drug products that are potentially adulterated are not fit for their ordinary purpose, since their consumption could lead to illness. Further, the Certificate of Manufacture certified that the product was manufactured in accordance with

FDA regulations, which qualifies as a promise or affirmation made. ECF_19-8. Nevertheless, the Recall Notice evinces that the product did not actually conform to that promise, or the recall would not have been necessary. ECF_19-2. Since there is no dispute of material fact regarding several of the UCC requirements for the implied warranty of merchantability, Defendants indisputably breached the warranty. There is no question that the losses Plaintiff suffered are due to the recall, as they would not have occurred if Defendant had not required Plaintiff to quarantine its products and return them.

Turning to the issue of damages for breach of warranty, damages include "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted." WYO. STAT. ANN. § 34.1-2-714(b). In the present case, the parties have agreed that the value of the goods if they had been as warranted was $116,909.22. ECF_19-4; ECF_19-5; ECF_19-1, Affidavit ¶ 21; ECF_19-11. As the goods were accepted, the products were valueless. Therefore, calculating damages under this UCC provision results in the same outcome. The damages owed to Plaintiff for breaching the implied warranty of merchantability were $116,909.22.

### D. Federal Rules of Civil Procedure Rule 56(d)

Defendant, in apparent recognition that is has presented no factual information upon which this Court could find a question of material fact, now requests additional discovery. Specifically, Defendant requests the deposition of Tony White, president and owner of Plaintiff. In the affidavit of its attorney, Defendant asserts additional facts it needs to respond to the summary judgment motion. ECF_21-2 at 2–3. Information sought included purchase order language, language of a quality agreement, reasonable costs of Plaintiff's

18

compliance with the recall, and legal duties. For reasons that remain unexplained to the Court, neither party has been able to locate copies of any purchase orders, even though both parties assert there were purchase orders. The existence of any quality agreement, other than the written assurance provided by Defendant is unknown. Defendant's wish to inquire regarding duties is a legal issue and not a proper subject for deposition. Defendant also wishes to know what efforts, if any, Plaintiff undertook to independently test the product delivered by Defendant.

Relief under Rule 56(d) is available upon a showing by the non-moving party as to what efforts it undertook to obtain the information and why such efforts were unsuccessful. *Hackworth*, 468 F.3d at 732. It must further show why granting additional time will allow the party to discovery such information and that such information will be relevant to its defense as to the motion for summary judgment. *Id.* The parties' diligence in seeking the information is a relevant consideration by the court. *Jacked Up, L.L.C.*, 854 F.3d at 816; *Rivera-Almodóvar*, 730 F.3d at 28–29. In this matter, the Defendant served its "First" discovery requests on November 1, 2019. This is the same date the Court established as the discovery cutoff date. No interrogatory requested information about testing conducted by Plaintiff. There are requests for production related to such testing, but the responses make it clear that Plaintiff does not undertake any such testing. The record supports the finding that Defendant did not undertake any discovery in this matter until the discovery cutoff date. Defendant may wish for more information, but it squandered the entire discovery period without seeking such information. The Court will not allow parties to sit on their hands during the period of time set aside for discovery and then seek additional

time pursuant to Rule 56(d). In addition, Defendant fails to establish what facts it could reasonably develop which would assist in its defense of the Motion for Summary Judgment. For these reasons, Defendant's Rule 56(d) affidavit requesting additional discovery is denied. The Court finds that the Rule 56(d) request, which comes after the close of discovery, is not appropriate in the present case.

### E. UCC Law Pertaining to Incidental Damages

One question that remains regards Plaintiff's rights to incidental damages under the UCC. The UCC allows buyers to recover incidental damages that resulted from the seller's breach, including "expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach." WYO. STAT. ANN. § 34.1-2-715(a). In an exhibit [ECF_19-7] attached to Plaintiff's Motion for Summary Judgment, Plaintiff claims incidental damages amounting to $75,922.71 were incurred as a result of returning the drug products at issue. This number includes attorneys' fees incurred during the recall process and during this litigation. Yet Plaintiff did not support its right to these incidental damages with admissible evidence. The reference to an unsupported document which contains conclusionary and unspecified amounts does not satisfy Plaintiff's burden. Neither did Defendant discuss this claim, except to dispute that Plaintiff is not entitled to attorneys' fees under the UCC. Therefore, the Court must address whether there is a dispute of material fact regarding the incidental damages to which Plaintiff is entitled.

It is generally acknowledged that each party should bear its own attorneys' fees absent an expressed contractual or statutory provision for such fees. *Dwan v. Indian Springs Ranch Homeowners Ass'n, Inc.*, 232 P.3d 1183, 1186 (Wyo. 2010). However, incidental damages are recoverable under the UCC. WYO. STAT. ANN. § 34.1-2-715(a). While the UCC is silent as to attorneys' fees, its list is not intended to provide an exhaustive list of recoverable incidental damages. *See id.* cmt. 1. Nevertheless, the Tenth Circuit has concluded that whether to award attorneys' fees is based on state law. *Bill's Coal Co. v. Bd. of Pub. Utils.*, 887 F.2d 242, 246 (10th Cir. 1989). Adhering to this rule, the Tenth Circuit has analyzed another incidental damages UCC section with language identical to Wyoming's and concluded that incidental damages under the UCC do not include attorneys' fees. *Webco Indus., Inc. v. Thermatool Corp.*, 278 F.3d 1120, 1133 (10th Cir. 2002) (concluding that the Michigan Supreme Court would emphatically reject awarding attorneys' fees as incidental damages due to other cases where it had refused to grant non-statutory attorneys' fees); *see also Bills Coal Co.*, 887 F.2d at 246 (refusing to grant attorneys' fees after examining Missouri law that also did not explicitly list attorneys' fees in the incidental damages section of its UCC).

Persuasive authority also indicates that courts do not favor granting attorneys' fees for the actual litigation expenses in a UCC case. *See, e.g.*, *Keck v. Wacker*, 413 F. Supp. 1377, 1384 (E.D. Ky. 1976); *Murray v. Holiday Rambler, Inc.*, 265 N.W.2d 513, 527–28 (Wis. 1978); *Sellinger v. Freeway Mobile Home Sales, Inc.*, 521 P.2d 1119, 1123 (Ariz. 1974). Nevertheless, when a UCC breach necessitates attorneys' fees for some reason other than litigating the actual breach, such as when an attorney might be needed to answer

legal questions related to returning a recalled or defective product, then it appears logical to conclude that those attorneys' fees *are* recoverable under the incidental damages provision. *See, e.g.*, *Chemco Indus. Applicators, Co. v. Aetna Cas. & Sur. Co.*, 366 F. Supp. 278, 286 (E.D. Mo. 1973) (allowing recovery from the seller for attorneys' fees expended as a result of the buyer distributing the seller's defective product). This Court concludes that the Wyoming Supreme Court would refuse to grant attorneys' fees for the litigation of the breach of contract under the incidental damages provision of the UCC. However, attorneys' fees associated with the recall itself—not the ensuing litigation to recover remedy for the breached contract—should be recoverable.

The issue of incidental damages, including but not limited to attorneys' fees, brings the Court to a quandary in the present case since neither party effectively addressed incidental damages in briefing or oral arguments. As mentioned previously, Plaintiff provide an unsupported document claiming $75,922,71 in incidental expenses. Some of these expenses include those logistically related to the recall, others include attorneys' fees specifically related to conducting the recall, others include attorneys' fees related to litigation of the present case. None of the expenses claimed are supported by affidavit and the amount of the expenses are not referenced in the summary judgment briefings by either party. Therefore, the Court concludes that there is not enough evidence to support granting summary judgment on the issue of incidental damages under Wyoming Statute § 34.1-2-715.

IT IS THEREFORE ORDERED that:

1. Summary Judgment is GRANTED as to all matters except the amount of incidental damages to which Plaintiff is entitled;

2. Summary Judgment is DENIED as to the issue of incidental damages, which will not include attorneys' fees that arose specifically as a result of this pending litigation.

Dated this 16th day of December, 2019.

MARK L. CARMAN
UNITED STATES MAGISTRATE JUDGE